UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HOLLY J. EISBERNER,
           **Plaintiff,**

    v.                                                        Case No. 12-C-0699

DISCOVER PRODUCTS, INC., et al.,
           **Defendants.**

## DECISION AND ORDER

In July 2012, Holly J. Eisberner filed a complaint against three of her creditors—Discover Products, Inc., World Financial Bank, Inc., and GE Capital Retail Bank—under the Fair Credit Reporting Act ("FCRA"). In January 2013, I granted the defendants' motions to dismiss the complaint for failure to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6), but gave Eisberner leave to file an amended complaint. Eisberner has filed that complaint—which is her second amended complaint—and two of the three defendants have filed their answers. Defendant GE Capital Retail Bank ("GE"), however, has filed a motion to either dismiss the second amended complaint for failure to state a claim against it, or to grant summary judgment in its favor on the claims presented by the complaint, see Fed. R. Civ. P. 56.

The factual background of this case is as follows. In April 2011, Eisberner commenced a proceeding in a Wisconsin trial court under § 128.21 of the Wisconsin Statutes. Under § 128.21, a debtor who is earning wages or salary but who cannot pay her bills on time may amortize those debts over a period of up to three years. A debtor commences a proceeding under § 128.21 by filing a petition with the court. The court will

then appoint a trustee. The debtor meets with the trustee to develop a plan to pay the debts subject to the petition in full within three years. If it appears to the trustee that the debtor has sufficient wages to pay her debts over that time, the trustee will recommend an amortization plan to the court. Creditors may object to the plan, and then the court decides whether to approve the plan. If the court approves the plan, the debtor makes payments to the trustee, and the trustee pays the creditors in accordance with the plan. While the plan is pending, the creditors are prohibited from using execution, attachment, or garnishment to collect the debts. However, unlike in a federal bankruptcy, the creditors are not prohibited from commencing or continuing any other collection activity against the debtor. If the debtor fails to make any payments due under the plan, the court may dismiss the proceeding.

In Eisberner's case, the court ordered her to begin making payments to the trustee pursuant to her proposed plan on May 3, 2011. However, at that time, the court had not approved the plan, and so the trustee did not distribute the payments to Eisberner's creditors. Instead, the trustee notified the creditors of the proposed plan and their opportunity to object. None of the defendants objected to the plan, and the court approved it on July 7, 2011.

In December 2011, Eisberner reviewed the credit reports maintained on her by the three national credit-reporting agencies. In her view, the reports did not accurately reflect the status of her account with GE, which was a credit-card account included in her § 128.21 plan. She thus sent dispute letters to the credit-reporting agencies. Under the Fair Credit Reporting Act, the agencies were required to investigate the dispute. See 15 U.S.C. § 1681i. As part of this investigation, the agencies sent notices of the dispute to

GE, a "furnisher" of information within the meaning of the FCRA. See 15 U.S.C. § 1681i(a)(2). Once GE received this notice, the FCRA required it to do the following: (1) conduct a reasonable investigation with respect to the disputed information; (2) review all relevant information provided to it by the credit-reporting agencies; (3) report the results of the investigation to the agencies; and (4) if the information is found to be inaccurate or incomplete, report the results to all credit-reporting agencies to which it originally provided the erroneous information. See 15 U.S.C. § 1681s-2(b); Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005).

After GE performed its investigation and reported its findings to the credit-reporting agencies, the agencies sent Eisberner a copy of GE's report. GE's report described Eisberner's account as "charged off," but it also reflected that she had been making regular monthly payments towards the balance of the account since July 2011, the month in which her § 128.21 plan was approved.[1] However, the report did not state that the payments had been made pursuant to a §128.21 plan or otherwise indicate that Eisberner was repaying the debt as part of a formal, court-supervised proceeding.

Eisberner contends that GE's post-investigation description of the status of her account was incomplete or inaccurate for three reasons. First, she contends that GE's describing her account as "charged off"—which means that the account had been past-due

---

[1]GE's post-investigation report is not attached to the complaint. However, Eisberner's counsel attached it to a declaration he submitted in opposition to the present motion. Because Eisberner references this report in her complaint, it is essential to her claim, and she concedes that the copy of the report attached to her counsel's declaration is authentic, I may consider the report without converting the present motion into a motion for summary judgment. See, e.g., Hecker v. Deere & Co., 556 F.3d 575, 582–83 (7th Cir. 2009).

for 180 days—was inaccurate because she made a payment to her § 128.21 trustee within 180 days of delinquency. (Second Am. Compl. ¶¶ 38–45.) Second, she contends that GE's describing her account as "charged off" was inaccurate because GE's accounting standards might have required it to "re-age" her account—which means returning it to current status—after she filed for relief under § 128.21 and made consecutive payments pursuant to her plan. (Second Am. Compl. ¶¶ 46–56.) Third, she contends that GE's description was incomplete because it did not indicate that her account was subject to a § 128.21 plan. (Second Am. Compl. ¶¶ 57–76.)

As noted, GE has brought both a motion to dismiss for failure to state a claim and a motion for summary judgment. I will start with the motion to dismiss and will ask whether Eisberner has stated plausible claims against GE. See Ashcroft v. Iqbal, 556 U.S. 662, 570 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–556 (2007). A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Id. As the Seventh Circuit has explained, "the fact that the allegations undergirding a plaintiff's claim could be true is no longer enough to save it . . . . [T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote." Atkins v. City of Chicago, 631 F.3d 823, 831–32 (7th Cir. 2011).

In assessing whether Eisberner's complaint taken as a whole establishes a nonnegligible probability that she has a valid claim against GE, I start by emphasizing that, to prevail on her claim, Eisberner must prove more than that the information GE furnished to the credit-reporting agencies remained incomplete or inaccurate in some respect after GE completed the investigation required by § 1681s-2(b). Rather, Eisberner must show that GE's failure to correct the alleged inaccuracies or omissions in the furnished information was the product of unreasonable behavior—which is to say, negligence. See Westra, 409 F.3d at 827. In other words, so long as GE acted reasonably, it will have complied with its obligations under the FCRA even if Eisberner is able to prove that the furnished information remained incomplete or inaccurate in some respect. Thus, to survive a motion to dismiss, Eisberner's complaint must contain factual allegations that give rise to a nonnegligible probability that GE acted unreasonably in failing to correct any inaccuracies and omissions that remained in the furnished information.

Eisberner's first alleged inaccuracy is GE's describing her account as "charged off" when in fact she made a payment to her § 128.21 trustee within 180 days of the account's becoming delinquent. "Charged off" is a term that a retail creditor uses to describe a non-performing loan that it considers a loss and that it must take into consideration when calculating its reserves for credit losses. See Nemes v. Frontier Bank, CV-06-061-FVS, 2006 WL 3408633, *1 (E.D. Wash. Nov. 27, 2006); U.S. Gov't Accountability Office, GAO-09-748, Credit Cards: Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology 5–6 & nn. 4, 6 (2009) (hereinafter "GAO Report"), available at http://www.gao.gov/products/GAO-09-748 (last viewed July 16, 2013). Banking regulators have issued a policy, known as the Uniform Retail Credit

5

Classification and Account Management Policy ("URCCAMP"), that establishes standards for the classification of retail credit by financial institutions such as GE. See 65 Fed. Reg. 36,903 (June 12, 2000). Under this policy, a financial institution must charge off a loan if it remains in delinquency for 180 cumulative days. Id. at 36,904; GAO Report, supra, at 5 n.4.

Here, Eisberner alleges that she made her last direct payment to GE in December 2010 and that her account went into delinquency when she failed to make her January 2011 payment. Eisberner did not make any payments towards the balance of her account between then and the time she commenced her § 128.21 proceeding. On May 25, 2011, which was less than 180 days from the date on which Eisberner's account with GE first went into delinquency, the § 128.21 trustee received a lump-sum payment from Eisberner in connection with her plan. At that time, the court had yet to approve the plan, and so the trustee did not distribute the payment to Eisberner's creditors. GE received its first distribution from the trustee on July 13, 2011, which was more than 180 days from the date on which the account went into delinquency. By that point, GE had charged-off the account, and in August 2011 it notified the credit-reporting agencies of this fact. GE continued to report the account as charged off even after it began receiving payments from Eisberner's § 128.21 trustee. However, as noted, once GE started receiving payments, it included this information in its reports to the credit-reporting agencies.

Eisberner argues that because she made a payment to her § 128.21 trustee before her account had been delinquent for 180 days, it was inaccurate for GE to describe her account has "charged off." Eisberner contends that the trustee was GE's fiduciary, and that therefore a payment to the trustee constituted a payment to GE as of the date the

6

trustee received the payment, even if the trustee did not actually distribute the payment to GE until a later date. However, Eisberner does not cite any portion of the URCCAMP or any other accounting standard that would have allowed GE to refrain from charging off her account on the basis of the payment received by the trustee in connection with a proposed § 128.21 plan that had yet to receive judicial approval. Moreover, it is doubtful that any such standard exists. The trustee was not GE's agent and was not under its control, and so GE could not have demanded that the trustee distribute the payment to it as soon as he received it. Moreover, if the court did not approve Eisberner's proposed plan, the trustee would not have distributed the payment to GE. Rather, he would have returned the payment to Eisberner. In light of this, it is impossible to conclude that there is a nonnegligible probability that Eisberner will be able to prove that GE acted unreasonably in continuing to describe Eisberner's account as charged off even though she had made a plan payment to her trustee within 180 days of delinquency. It is at best unknown whether the accounting standards applicable to GE would have even allowed it to refrain from charging off the account under these circumstances. And certainly Eisberner has pointed to nothing suggesting that the applicable accounting standards <u>required</u> GE to refrain from charging off the account under these circumstances. Thus, Eisberner has not pleaded facts from which it can reasonably be inferred that at the time GE reported the results of its § 1681s-2(b) investigation it either knew or should have known that continuing to describe the account as "charged off" was inaccurate given Eisberner's payment to her trustee.

Eisberner's second alleged inaccuracy involves GE's failure to "re-age" her account once her § 128.21 plan was approved and she had made several regular plan payments.

7

"Re-aging" is another accounting classification that applies to retail credit. The URCCAMP defines it as "[r]eturning a delinquent, open-end account to current status without collecting the total amount of principal, interest, and fees that are contractually due." 65 Fed. Reg. at 36,905 n.3. The URCCAMP does not require any financial institution to re-age any account. Rather, it specifies that institutions that choose to re-age should establish and adhere to written re-aging policies, and it contains minimum criteria that institutions should incorporate into their policies if they choose to re-age accounts. Id. at 36,905. These criteria are: (1) the borrower has demonstrated a renewed willingness and ability to repay the loan; (2) the account has existed for at least nine months; and (3) the borrower has made at least three consecutive minimum monthly payments or the equivalent cumulative amount. Id. In the present case, Eisberner alleges that at the time she triggered GE's investigation obligations under § 1681s-2(b), her account met the URCCAMP's minimum re-aging criteria. In particular, Eisberner contends that the approval of her § 128.21 plan demonstrated a renewed willingness and ability to repay the loan, and that by the time she disputed GE's classification of her account she had made at least eight consecutive monthly payments under her plan, which was the equivalent of at least three consecutive minimum monthly payments. However, Eisberner concedes that the URCCAMP does not require an institution to re-age an account just because it meets the minimum criteria and that she does not know whether it was GE's policy to re-age all accounts that met those criteria. (Second Am. Compl. ¶ 52.) Still, she argues, it is plausible to infer that it was GE's policy to re-age all accounts that met those criteria and that GE negligently failed to follow that policy during the course of its investigation into the completeness and accuracy of the information it had furnished to the credit-reporting agencies.

GE has submitted a declaration from one of its employees stating that GE's internal policies did not require it to re-age Eisberner's account. (Decl. of Martha A. Koehler ¶ 9, ECF No. 60.) GE argues on the basis of this declaration that it is entitled to summary judgment on this issue. However, as Eisberner correctly notes, it would be inappropriate to grant summary judgment on the basis of the statements in GE's employee's declaration without giving Eisberner an opportunity to depose this employee or otherwise take discovery about GE's internal re-aging policies. See Fed. R. Civ. P. 56(d). Thus, I will disregard this declaration and instead examine whether the second amended complaint alleges sufficient factual matter to render plausible the inference that GE's internal policies required re-aging. If it does not, then Eisberner is not entitled to discovery. See Atkins, 631 F.3d at 831–32.

As noted, Eisberner does not know what GE's internal re-aging policies might have been and therefore does not know whether those policies required that her account be re-aged. Instead, in an attempt to make the inference that those policies required re-aging plausible, Eisberner alleges the following: (1) her account met the minimum criteria for re-aging specified in the URCCAMP; (2) she is aware of at least some creditors that have re-aged accounts that are subject to § 128.21 plans; (3) because URCCAMP is a uniform policy, it is reasonable to infer that if some creditors re-age accounts that are subject to § 128.21 plans, then they all do. (Second Am. Compl. ¶¶ 51–53.) However, this reasoning is fallacious, and the fallacy lies in the third step. Although the URCCAMP is a uniform policy, it does not require that all financial institutions re-age all accounts that the URCCAMP permits them to re-age. Rather, it establishes certain minimum standards that an institution must adhere to if it decides to re-age accounts. Moreover, the URCCAMP

9

does not prohibit an institution that chooses to re-age accounts from adopting a re-aging policy that is more conservative than the minimum standards identified in the URCCAMP. Thus, although the URCCAMP might permit an institution to re-age an account that is subject to a § 128.21 plan and Eisberner is aware of at least some creditors that have done so, it does not follow that all or even many creditors do so. Some creditors might not re-age any accounts; others might have more conservative re-aging policies, under which Eisberner's account might not qualify for re-aging. It is thus not plausible to infer from the URCCAMP minimum criteria and the fact that some creditors re-age accounts subject to § 128.21 plans that (1) GE's internal policy required it to re-age Eisberner's account and (2) GE negligently failed to follow this policy. Rather, it is just as likely that GE did not re-age Eisberner's account because either GE does not re-age accounts or Eisberner's account did not meet GE's re-aging criteria. Thus, all Eisberner has pleaded is a "sheer possibility" that GE has acted unlawfully in failing to re-age her account. Iqbal, 556 U.S. at 678. The allegations of the complaint create no more than a suspicion of a legally cognizable right of action; they do not raise Eisberner's right to relief above the speculative level. Twombly, 550 U.S. at 555. Accordingly, Eisberner's re-aging claim will be dismissed.

Eisberner's remaining claim is that GE's failure to add an explanatory note stating that she was repaying her account through a "personal receivership" or "wage-earner plan" rendered the information it had furnished to the credit-reporting agencies incomplete. Recall that GE described the status of Eisberner's account as "charged off" and that GE reported that Eisberner had been making regular monthly payments towards the balance of her account since July 2011, when her § 128.21 plan was approved. Eisberner

10

contends that, in addition to reporting these facts, GE should have added an alphanumeric code to the information it furnished to the credit-reporting agencies that means "personal receivership" or "wage-earner plan." She alleges that codes for these terms exist in Metro 2, which is the standardized format used in the credit-reporting industry for reporting information about consumer accounts.

An initial issue with respect to this claim is determining what it means for furnished information to be "incomplete." The parties do not attempt to define this term, but from their briefs it seems reasonable to infer that they would agree that information furnished to a credit-reporting agency should be considered incomplete when a reasonable furnisher would have known that it was omitting a fact that, if included, would likely have resulted in a significantly more favorable portrayal of the consumer's creditworthiness.

Accordingly, to succeed on her claim that GE is liable for omitting the fact that she was repaying her account through a personal receivership or wage-earner plan, Eisberner must show that GE either knew or should have known that omitting this fact would result in a significantly less favorable portrayal of her creditworthiness. But the allegations of Eisberner's complaint do not create a nonnegligible probability that she will be able to show this. To begin with, the allegations do not create a nonnegligible probability that GE's noting the presence of a personal receivership or wage-earner plan would have caused users of credit reports to deem her significantly more creditworthy. Eisberner alleges that it can be inferred from the fact that codes for "personal receivership" and "wage-earner plan" exist in Metro 2 that users of credit reports deem the presence of a formal repayment plan relevant. (Second Am. Compl. ¶¶ 61–66.) That might be so, but it would not follow that users of credit reports view the presence of a formal plan as a good thing. It is just as

11

likely that users of credit reports view the presence of a formal plan as a reason to deny credit or take other adverse actions. Eisberner also alleges that she has spoken with a Chapter 128 trustee, Susan Schuelke, who is of the opinion that "it is at least plausible that many creditors, insurers, and employers look favorably upon consumers who take the initiative to pay creditors through formal, court-supervised workout plans." (Second Am. Compl. ¶ 69.) However, this opinion is based on her observation that she has seen many instances in which a consumer's credit rating improved during a § 128.21 proceeding. (Second Am. Compl. ¶¶ 67–68.) But if a consumer is participating in a § 128.21 proceeding, then the consumer must be making regular monthly payments on his or her past-due debts. Thus, these allegations do not indicate whether it was the presence of the § 128.21 proceeding itself, rather than the fact that the consumer had begun making regular monthly payments (a fact that GE included in its report), that resulted in the improvement in the consumer's credit rating. Moreover, Schuelke does not indicate whether any of the creditors subject to the plans she is referring to used the codes for "personal receivership" or "wage-earner plan" in their reporting. If they did not, then of course any improvement in the consumers' credit rating could not have been attributable to the use of those codes.

Even if it were reasonable to infer from the allegations of the complaint that GE's making reference to Eisberner's § 128.21 plan would have caused her credit rating to improve, dismissal of this claim would still be appropriate because the allegations do not give rise to a nonnegligible probability that GE should have known that omitting this fact was likely to hurt her credit rating. There are simply no allegations in the complaint suggesting that it is common knowledge among financial institutions such as GE that some

12

users of credit reports view formal repayment plans so positively that they are likely to extend credit or take some other positive action if they know that the consumer is paying his or her debts through such a plan rather than independently. Accordingly, this claim will be dismissed.

## CONCLUSION

For the reasons stated, GE will be dismissed as a defendant in this case. This result makes it unnecessary to consider GE's alternative motion for summary judgment. I think that the reasoning in this opinion applies with equal force to the remaining two defendants. However, they have not moved to dismiss the complaint, and perhaps Eisberner would contend that there are differences in the claims against them that would make dismissal of those claims inappropriate. Therefore, I will hold a status conference for the purpose of determining whether Eisberner contends that there are any differences in her claims against the remaining defendants that would prevent me from dismissing those claims in accordance with the reasoning in this opinion.

Accordingly, **IT IS ORDERED** that GE's motion to dismiss the second amended complaint against it is **GRANTED**. GE is hereby dismissed as a defendant.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **July 31, 2013 at 11:30 a.m.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 17th day of July, 2013.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge